Allen, P.
The decree from which this appeal has been taken, subjected the Chesterfield coal and iron mining company to a heavy recovery on account of a debt alleged to be due to the appellees from the Black Heath company of colliers. The first question, *342 therefore, which arises upon the record, and which is presented by the first assignment of errors, relates to existence of this debt. Was the latter company a^ any time liable to the appellees for this debt; and ^ so ^al>le, has that liability been discharged by the acts of the appellees ?
On the 16th of December 1840 the widow of William Finney, in her own right, and as the next friend of her infant children, filed their bill against John Heth, Beverly Heth, and the Black Heath company of colliers, setting forth their claims as cestuis que trust under a deed of marriage settlement and other deeds touching the trust property, under which John Heth had become sole surviving trustee; and complaining of a sale made by John Heth in January 1837 of the whole trust property; which, they alleged in the bill, was made by John Heth without authority, and directly against the plain provisions of the deeds under which he was acting as trustee; and were a clear and distinct breach of trust committed by him, and by all ' who participated with him in the sale: and that at the sale of the trust property made by John Heth as trustee, he as the manager of the business of the Black Heath company of colliers, purchased for the company slaves, and perhaps other property, to the amount of eleven thousand three hundred and forty-five dollars. The bill further averred that at the said sale, Beverly Heth purchased land and slaves to the amount of twenty-five thousand one hundred and three dollar's and six cents. It made John Heth, Beverly Heth and the Black Heath company of colliers defendants, and prayed for a decree that said purchasers should pay the. principal and interest due from them respectively, and that John Heth should pay any balance appearing to be due from him, and for general relief.
To this bill John Heth filed his answer, admitting *343 the sales of the trust property as stated in the bill; thereby admitting the purchase of the slaves by himself as manager of the Black Heath company at the sale made by him as trustee, at the price charged. And in regard to that purchase he states in his answer, that the sufficiency of the securities of the debt due from the Black Heath company for the purchase money of the slaves is undoubted, as until it is paid to this respondent the best property of that company is bound for it. What the securities for the debt were, he does not state: if any bond was given, it was not exhibited. The record shows that prior to this period he claimed to own or control almost all the stock of the company, and that he had actually made a transfer, by his deed of the 29th day of April 1840, to Stevenson and Brockenbrough, as trustees, of two thousand six hundred and eighteen shares of said company ; the deed reciting that the remaining three hundred and eighty-tsvo shares were vested in other persons, but were intended to be purchased or got in by him. The answer was sworn to on the 14th of January 1841, and filed on the 6th of March thereafter.
On the 30th of March 1841 an interlocutory decree was rendered, which recites, “ that the cause came on to be heard upon the bill, the answer of the defendant John Heth, with the replication thereto, the bill taken for confessed against the other defendants, more than two months having elapsed since the filing of the plaintiffs’ bill and the return of the subpoenas, with service acknowledged by the other defendants, and they still failing to appear and answer, and sundry exhibits.” The decree then directs accounts to be taken in relation to the trust estate, and amongst them an account showing the exact amount due from the Black Heath company and from Beverly Heth to John Heth as trustee, or to the trust fund. The commissioner, in the report made out in obedience to this decree, states *344 that John Farrar attended and filed the accounts of John Heth as trustee, with the vouchers, from which the commissioner stated the accounts returned by him. John Farrar was afterwards made a defendant by an amended bill, as clerk and agent of said company; and in his answer admits he was such clerk and agent, and that as such the books and papers of the company were kept by him, and still remained in his possession. In the account returned by the commissioner the trustee was charged as of the 24th of January 1837, with eleven thousand three hundred and forty-five dollars, amount of articles purchased by the Black Heath company. No accounts were taken at this time with any parties except with the trustee; and in the account so taken the trustee was charged with the whole amount of the sales of the trust property; and there being no exception, the account was confirmed; and on the 27th of October 1841 an interlocutory decree was rendered against John Heth for the whole amount of the trust fund unaccounted for. The decree directed the commissioner, if required by the plaintiffs, to execute those parts of the decretal order directing the accounts, which had not been executed ; and then proceeds to declare that liberty is hereby reserved to the plaintiffs to resort to this court for any further decree against the defendants, or any of them, and as to any of the subjects mentioned in the plaintiffs’ bill in this suit, to which they may show themselves entitled in the event this decree shall prove unavailing in the whole or in any part. And liberty was given to them to amend their bill and make new parties.
On this decree an execution was issued against John Heth; the sum of four hundred and thirteen dollars and thirty-six cents made as of the 7th of February 1841; and a return of no effects found to make the balance.
Having thus made an unsuccessful effort to collect *345 the amount of the trust fund from the trustee, and shown by the official return of the proper officer, that the decree against him had proved unavailing for nearly the whole amount decreed, the appellees, under the leave reserved to them in the said decree, to resort to the court for any further decree against the defendants, or any of them, and as to any of the subjects mentioned in the suit, filed their amended and supplemental bill on the 11th of February 1842, in which they make new parties, amongst them the Chesterfield coal and iron mining company, a new company incorporated by an act of assembly passed the 15th December 1840; Sess. Acts of 1840-41, p. 148; and allege in their bill, amongst other things, that John Heth, untruly pretending that he was the owner of the whole stock of the Black Heath company, had made some contract with the Chesterfield coal and iron mining company, by which the whole property of the Black Heath company, except slaves, had been taken possession of by the Chesterfield company, by their agents in this country; and that the stockholders of the latter company were all aliens, and with the exception of one of the agents, non-residents. They further state, that if John Heth had ever executed a deed conveying the property or stock of the Black Heath company to the members of the Chesterfield company, it had never been recorded in the County court of Chesterfield county, the county where the property was situated. And the bill contains the further and most material averment bearing on one of the questions arising in this controversy, that the property being corporate property, even if John Heth had been the owner of all the stock, he had no legal power or authority to convey as an individual the corporate property, exempt from the payment of the debts of the company. The bill furthermore, as to this branch of the case, alleges a sale by John Heth of some of the *346 slaves purchased by .the Black Heath company, and seeks to charge them in the hands of the purchasers or and prays that the debt due from the Slack Heath company be satisfied out of the proceeds sa*^ s^aves> or ou^ °f the other property of the Black Heath company in the possession of the Chesterfield company, and under the control of their agents, who are made defendants.
The bill also details the circumstances attending the sale of the land and other trust property to Beverly Heth; alleges a conveyance by Beverly Heth of the land and slaves pending the suit, to a trustee to secure certain creditors; and prays that the property be re-conveyed to the appellees, or sold, and the proceeds applied to the payment of the debt due to them from John Heth.
On the 1st of November 1842 the cause again came on to be heard on that branch of the case affecting Beverly Heth’s purchases; and the court decreed that John Heth committed a breach of trust in the sale of the trust property to Beverly Heth, in which the latter actively concurred; that the other defendants claiming under him were pendente lite purchasers, and they with their vendor should be regarded as trustees of the property for the appellees; and directed a reconveyance thereof to a trustee for their use. And an enquiry was directed to ascertain what portion of the property held by the trustees of Beverly Heth was the property sold to him by John Heth as trust property ; and an account of hires of the personal property, and of rents, profits and permanent improvements was directed.
From this decree an appeal was taken to this court by two of the creditors of Beverly Heth. This appeal brought up the whole case for revision. The correctness of the decree of the 27th of October 1841 against John Heth for the whole amount of the trust *347 fund, reserving liberty to pursue the purchasers if the decree against the trustee was unavailing, as well as the propriety of the decree of November 1st, 1842, setting aside the sale of the land, and directing a re-conveyance of the land and such of the slaves as upon . r enquiry should be ascertained to have been part of the trust fund, were open for consideration.
It was assigned as one of the errors committed in the cause, that to repudiate the sales made by the trustee was incompatible with the course pursued, as the appellees had sought to enforce them by every means in their power; had taken a decree against the trustee for the balance due, and in part enforced it. On the 12th of May 1845, this court affirmed the decree.
After this affirmance, further proceedings took place in the court below in relation to the branch of the case now under consideration j and a report was made by the commissioner ascertaining the amount of the debt due from the Black Heath company on account of the slaves purchased at the sale of the trust property. In this account the company receives credit for several sums paid as interest by the company on this debt; and the deposition of John Farrar proves that those charges against the appellees were taken from the books of the company. He also furnishes a list of the slaves purchased for the company, and their prices: and in his answer to the amended bill, he states that a short time after the trust sale the president of the company directed him as clerk fo charge against the company on its books a note given to John Heth for the amount of the company’s purchase at the sale of the trust estate; which entry he made in the presence of the president.
• From this reference to the pleadings and proofs in the cause, there can be no question as to the existence of the debt at one time. It is charged in the original *348 bill, and that bill was taken as for confessed against the Black Heath company. This of itself concludes company. But the report of the commissioner charges John Heth with the debt; and to that report there was no exception. And the clerk and agent of 1 ° the company proves that the debt was entered on the books of the company as a charge against it, and credits entered for the interest paid.
The original existence of the debt does not appear to have been seriously controverted; and accordingly, in the special statement made out at the instance of the Chesterfield company, the Black Heath company is charged with the amount given for the property purchased at the trust sale.
But it is argued, that the appellees have elected to disaffirm the sale and pursue the property; that the purchase was merely void, and the slaves remained their property. It is true that John Heth having been the agent for the Black Heath company in making the purchase, as well as the trustee who sold, the company could not deny notice; nor have they done so. That it was a gross violation of duty and breach of trust in the trustee, to turn over the trust property to the company of which he was principal stockholder and the manager, without securing and investing the price, has not been controverted; and the cestuis que trust had a right to set aside the sale, and follow the property, if it could be traced, in the hands of the company, or any others, claiming it with notice of the breach of trust.
The question raised by this objection has already been adjudicated in this cause. Although the court gave a personal decree against the trustee for the whole amount for which he sold the trust property, it affirmed the right of the appellees to pursue the purchasers as to any of the subjects mentioned in the bill, if the decree against the trustee proved unavailing; *349 and the construction put upon this reservation is shown by the decree on the amended bill, which set aside the sale of the land and such of the slaves as were chased by Beverly Heth, so far as they could be traced in the hands of purchasers with notice: the 1 court thus holding that a personal decree against the trustee for the price did not preclude a resort to the property itself in the hands of the wrong-doer participating in the breach of the trust, or in the hands of those who had notice of the fraud. And if the property can be so pursued, the reason applies with equal force to the party himself. All who participate in a breach of trust are jointly and severally liable. A purchaser concurring in a fraudulent breach of trust, and, as in this case, actively participating in it, and converting the property to his own use, incurs the like liability with the fraudulent trustee. Pinckard v. Woods, 8 Gratt. 140; Attorney General v. Corporation of Leicester, 7 Beav. R. 176, 29 Eng. Ch. R. 176; Hill on Trustees 520, n. The relief afforded in equity in such cases is two fold, retrospective in order to remedy the mischief done, and prospective to prevent further injury. Hill on Trustees 621. The court endeavors in the first place to replace the parties in the same situation they would have been in if no breach of trust had been committed. And, therefore, where the trust property improperly disposed of can be followed in specie, as where it consists of real estate, it will compel the trustee or party in possession, if the latter have taken with notice of the trust, to reconvey the estate to the purposes of the trust. Hill on Trustees 522.
And where trust moneys are followed into land, the cestui que trust may either take the land for the whole, or may have a decree for a sale; and if there be a deficiency, then prove on the estate of the trustee. Hill 522, n. 1. It is true that where property has been *350 improperly sold by a trustee, the cestui que trust cannot claim both price and property; for that would be to get a double satisfaction; but he is entitled to one or the other; and it does not lie in the mouth of the fraudulent participator in the breach of trust to say , r , that the sale was void and so no debt was due; for this would be setting up his own wrong to protect himself. Nor can the decree of the court replacing the parties in the same situation they would have been in if no breach of trust had been committed, by restoring the property where it can be restored, be held to release the party from all personal responsibility for the residue which the purchaser has converted to his own use.
In this case, as all were before the court, and jointly and severally liable, the decree against the trustee was for their benefit; for if the fund could have been collected and invested according to the stipulations of the deed of trust, they would have been relieved, as it was not alleged that the prices bid for the property were too low; and the trustee was empowered from time to time to vest any part of the property in real estate or other property. The breach of trust resulted from his failure to collect the price, and in permitting the purchasers to take and convert the trust property to their own purposes, without paying for it, or giving any adequate security for the money. It was therefore proper, in every aspect of the case, that an effort should be made to collect the amount from the trustee before resorting either to the property or the purchasers.
If these views as to the effect of the decree in this case, or of the law as applicable to the facts of the cause, are correct, the court did not err in holding that the existence of the debt due to the appellees by the Black Heath company was proved, and that they had not lost their right to proceed against the company for payment: and, therefore, the first exception taken by *351 the Chesterfield coal and iron mining company to the report of Commissioner Shore, made under the decree of the 28th of October 1848, was properly overruled.
The second and third exceptions were sustained, and the credits allowed.
The prices of the two slaves surrendered to the appellees voluntarily by R. Grwathmey and Lewis Rogers, have been applied to the principal of the debt, the most favorable mode of applying the credit for the appellants. And having had the use of the slaves in a dangerous occupation, whereby one is proved to have been badly injured, a credit for their value, as at the time they were returned, is as much as they could claim.
Nor is there any just pretension for a claim to a credit for the whole amount of Beverly Heth’s purchases. They amounted to twenty-five thousand one hundred and three dollars and six cents. The price of the land was fifteen thousand dollars, leaving upwards of ten thousand dollars for slaves and other property. Of the slaves, it would seem six were recovered. For the land which was decreed to be restored and the price of the slaves John Heth would be entitled to a credit; but it is manifest the six slaves restored did not sell for the ten thousand dollars; and that sum, with the interest, would far exceed the value of the slaves returned, leaving Beverly Heth largely indebted to the trust fund. The» assumption that a credit should be given for the whole amount of Beverly Heth’s purchases, because by pursuing the property the sale must be considered as disaffirmed, and the appellees be restricted to the property alone, has already been adverted to. So far as the trust property could be reached, they were entitled to pursue it, without thereby losing their remedy against the fraudulent alienee for the price of so much as was converted to his own use, and could not be restored in specie. Nor does the failure *352 of the appellees to pursue the property in the hands of other purchasers or claimants, furnish any ground of complaint to their immediate debtor, the Black Heath company. Being directly responsible as participating in the breach of trust, the appellees have a right to look to the company for payment, as one of the original wrong-doers; and the company cannot insist on their creditor being sent on a doubtful and perhaps ineffectual pursuit of the property in the hands of those who, but for the intervention of the company, would not have acquired the possession of it.
If then the Black Heath company was alone sued, the appellees would have a right to a recovery against it for the amount of their claim, as ascertained by the decree, and to satisfaction out of the corporate property. And it remains to enquire whether, under the facts appearing in this record, they can charge this debt on the Chesterfield coal and iron mining company, either as holding the property of the Black Heath company, or as its successor liable for its debts at least to the extent of the property received from it.
The Black Heath company of colliers was incorporated by an act passed February 20th, 1833. The preamble, after reciting that B. Randolph, John Heth and Beverly Heth represented to the general assembly that they were owners of certain lands in Chesterfield county, on which there are valuable mines of coal, of a coal yard, and certain personal property, consisting of slaves, &c., and that they were desirous of carrying on their business under the management of a corporate body, proceeded to enact that the capital stock, consisting of the real and personal property aforesaid, should be divided into three thousand shares,' and that as soon as one thousand five hundred shares shall have been sold on the joint account of the proprietors, and by them duly conveyed by deeds recorded in said county, then that the title that the three *353 proprietors had in the capital stock should be vested-in them and the purchasers in proportion to the shares respectively held by them, and that the stockholders, their heirs and assigns, should be a body politic and-corporate by the name, &c., with the usual corporate powers. And it was further provided, that the stock-should be real estate, and as such pass by descent, devise and sale. By an act passed January 10th, 1837,-Sess. Acts 202, so much of the act before mentioned as declared the stock to be real estate, was repealed; and in lieu thereof it was enacted that it should bd¡deemed personal estate, to be transferred, and certificates thereof issued in such manner as the president? and directors or stockholders in general meeting should prescribe; with a proviso, that nothing in the act should be so construed as to prevent' the company from selling and conveying any part of such réal estate as they may hold, and which had been incorporated into stock, and thereby declared personal estate; or to authorize the conveyance of such real estate, when sold or disposed of, in any manner than'that prescribed by the lav/s of the commonwealth for the conveyance or disposal of real estate ;■ and- when so sold and conveyed, from being considered as real estate. These two acts constituted the charter of the Black Heath company, when the transactions between John Heth and the parties afterwards incorporated in the name of the Chesterfield coal and iron- mining, company, took place.
On the 29th of April 1840 a deed was executed between John Heth of the first part, Stevenson and5 Broekenbrough of the second part, and various individuals residing in England, of the third part;- which;* after reciting the charter of the Black Heath company as aforesaid, describing its landed property, reciting that two thousand six hundred- and eighteen' shares of the stock were then vested- in' John Heth, *354 afnd'that be intended to get in the remaining' outstanding shares 'Vested in other persons; and describing-various o'thér -portions of real estate belonging to Heth, or over which be had the control, proceeds torehite that said John Heth had proposed to the parties-of the third part to form a company with them, to: carry on the business of coal and iron mining, and to: vjás-t or to cause and procure to be vested in such com-' p!any the fee-simple and inheritance in possession, freél from all incumbrance of the real or landed property; of the Black Heath'-company, and the other-lands de-: scribed; and'that the said parties of-the third part-had agreed-with John .Heth to join in forming such--company, and -that they should purchase said property-which John Heth .had so proposed to vest in them, in . case the authority .of. the general assembly could be -: obtained .in tile, manner described. The deed then,for the consideration therein mentioned, sets forth that' Jphn Heth- -had-that. day transferred the two thousand ■ six'hundred arid eighteen shares, of said Black Heath'' company :to: .the ..parties of. the second part, on the hooks keptifor.the transfer of such shares; and had? also conveyed the .other land owned by said Heth, to1 said parties of the second part, .upon the various trusts ■ set forth.
.'On the 15th of December 1840, Bess. Acts 148, an' act was passed to incorporate the Chesterfield coal and 1 iron mining, company, as.provided for in the deed be-. fore referred to, and an agreement of the same date; with the.deed between Jo-bn Heth and the parties of the third part,' named in said deed. By this, act the: company thereby incorporated was invested with full ppwer and-authority in their corporate capacity to take; and receive: valid conveyances and transfers of all the:property, and stock owned or occupied by the Black; Heath company^ setting forth that the said stock con-; sisted. of. three! thousand shares, and describing the.' *355 lauds of"the company. The act also authorized and empowered the company to receive conveyances df and to hold the other property named in the deed of John Heth, before referred to. *
After the passage of this act another deed, dated the 3d of August 1841, was entered into' between John Peth and the persons constituting the' ’company, bi^ which certain differences between them were compromised, the terms of the agreement and. the deed to "Stevenson and Brockenbrough somewhat modified, and provision made for the indemnity of the Chesterfield ■coal and iron mining company against incumbranchs and defects of title ia the property agreed to be coniveyed by John Heth. This deed, however, makes ño specific conveyance of any of the property. ¿
-. In the answer put in by A. F. D. Gifford, be states he is the sole general agent of the Chesterfield company,; §nd he exhibits the deed, the articles of agreement, and .the articles of agreement and compromise before mentioned, to show how the company acquired their pror perty. He avers, that as such agent he -holds certain conveyances of real estate, all recorded in Chesterfield county, intended in part to carry into effect the con*tracts made with said John Heth, and which it is not deemed material, to the purposes of this suit to file or describe particularly. The answer further alleges^ $hat all the stock of the Black Heath company was regularly transferred to John Heth, and by him com veyed .to Stevenson and Brockenbrough, the trustees of the company, and afterwards transferred upon the books of the Black Heath company to the Chesterfield company.
. There does not appear, in any part of the record, a conveyance of any real property by the Black Heath company of colliers to the Chesterfield coal and irou mining company. The amended bill averred that John Heth, as an individual, had no legal power or authóí *356 pity to convey the corporate property, exempt from the debts of the company.
The proviso of the act of January 10th, 1837, making the stock personal estate, whilst it authorized the gale and conveyance of real estate theretofore created . into stock, declared the law should not be construed to authorize the conveyance of such real estate in any other manner than that prescribed by law for the conveyance or disposition of real estate. Such conveyance must be by deed duly executed in the name of the corporation by its duly authorized agent. In the absence of any such conveyance, the property still belongs to such company or its successor, the transferree of the stock.
Under this aspect of the case, it is unnecessary to consider many of the propositions so elaborately discussed at the bar: such as that,
ft The right of a corporation to dispose of and convey its real estate is commensurate with that of an individual.^’’
That although creditors may subject the corporate property, this right does not give a lien so as to attach to the property in the hands of the bona fide purchaser.
And although creditors may follow the assets in the hands of corporators who have sold out the whole corporate property and fraudulently appropriated the proceeds, yet such fraudulent appropriation would not affect the bona fide purchaser.
These propositions may all be sound; but they do . pot affect the present ease.
If the appellees had procured- a judgment or decree against the Black Heath company of colliers eo nomine» and issued their execution, what would have prevented a levy on the real estate of the company % Once vested in the company, it could be divested only by a conveyance executed by the company. A transfer of all the stock by the old to new stockholders, would *357 not destroy the relation in which creditors stood to the company and its property.
A share in a joint stock company is not strictly speaking a chattel, but bears a greater resemblance to a chose in action. “ If (says C. J. Shaw) a share in a bank is not a chose in action, it is in the nature of a chose in action, and what is more to the purpose, it is personal property.” By bank stock, say the Supreme court of Tennessee, is meant individual interest in the dividends as declared, and a right to a distribution <pro rata of the effects at the expiration of the charter. Angel & Ames Corp. § 560, where the cases are cited.
A corporation may be seized of real property, as well as be possessed of personal property ; but, as has been said by Lord Abinger, “ the interest of each individual shareholder is a share of the net produce of both when brought into one fund.” Bradley v. Holdsworth, 3 Mees. & Welsb. R. 422. And in Humble v. Mitchell, 11 Adol. & Ell. R. 205, 39 Eng. C. L. R. 46, it was held that shares in a joint stock company such as this, are mere choses in action, incapable of delivery, and not within the scope of the statute of frauds requiring certain contracts for the sale of goods, wares und merchandise, to be in writing. It would seem, therefore, to be clear law, that where, as in this case, the stock is declared to be personal estate, and the certificates are made transferable on the books of the corporation, and it is authorized to acquire real estate, such estate is vested in it as a corporation, and not in the individual shareholders; that the certificate of stock is evidence of the right of the owner to his proportion of the profits or dividends, and on the expiration of the charter, to his proportion of the assets remaining after the payment of the debts; and every purchaser of the stock takes it subject to the same liabilities. The transferree occupies the place- — sits in the seat of his predecessor.
*358 •.' It has been argued that the agreement of the parties contemplated and provided for a purchase of the which John Heth proposed to vest in them, and that the law incorporating the Chesterfield comPany ^nves^e(i it with the power and authority, in its corporate capacity, to take and receive valid conveyances and transfers of all the property and stock of the Black Heath company. It may be remarked that the deeds referred to make no provision, in express terms, for a conveyance by the Black Heath company. And .the law, while it authorizes a conveyance, also provides for a transfer of the stock. If a mere vesting of the property was all the law contemplated, there would have been no use in a transfer of the stock. By providing for both, the authority was given to step into the place of the corporation so merged in the one newly created; and the new corporation, by accepting the transfer of the entire stock, have thereby, under the authority given by their charter, placed themselves in the position of successors to the former corporation, liable, to the extent of the property received, to the debts, and entitled to all the rights of the former corporation. They have so construed their authority urnder the charter, by taking possession of and holding the property of the Black Heath company, as transferrees of the stock, since the time limited for the expiration of the charter of the Black Heath company.
It was decided in Rider v. Union Factory, 7 Leigh 154, that as a corporation, without express provision of law, could never hold property, and can only hold it for so long a time as the charter permits, that after the expiration of its charter it can hold no property; and therefore a judgment against it would be fruitless. And 1 Lev. 237, is cited to show, that by the principles of the common law debts of a corporation, either to it or from it, are extinguished by its dissolution. This decision was in 1836. And afterwards, and no doubt *359 in consequence of the suggestion contained in the opi--' nion in that case, the act of February 13th, 1S37, now incorporated in the Code, was passed. That act scribed general regulations for the incorporation manufacturing and mining companies which might thereafter be incorporated, and provided that when-such corporation should be dissolved by lapse of time or other cause, the corporate name, with the right to' sue and be sued, should continue for the purpose of collecting and paying debts and the distribution of its property.
As this law in terms was limited to joint stock com-' panies thereafter incorporated, a grave question might' arise as to the' right of the Chesterfield company to hold any of the property of the Black Heath company, since the time limited for its existence has expired, if the argument of the appellants and their construction of the agreements of the parties and the charter of the Chesterfield company be correct. The property was vested in the Black Heath company. The law. expressly provided for the mode of conveying such property; and no such conveyance is shown.- The: legal title must therefore have continued in the Black Heath company until its existence, as limited by the-charter, expired. No such difficulty arises, by giving the act incorporating the Chesterfield company the' construction contended for by the appellees, as authorizing the latter company, by accepting a transfer of: the stock, to take the place of the former company,to incorporate the former company with itself, and as' its successors to hold its property, with all its rights,' and subject to all its liabilities under the new charter.-
This, it seems to me, is the true construction to be • given to the'acts of these parties, and the charters re-: ferred to. -It conforms with the understanding of the' parties, as manifested by their acts. John Iieth, in-his answer to the original bill filed after the -deed to - *360 Stevenson and Brockenbrough, the trustees of these parties, and after the passage of the law incorporating the Chesterfield coal and iron mining company, states that the sufficiency of the security for the debt due from the Black Heath company for the purchase of slaves, was undoubted, as until it was paid, the best property of that company was bound for it. And the Chesterfield company, by taking a transfer of stock as their evidence of right, and providing for their indemnity, by retaining a lien on the royalty to be paid to John Heth, and stipulating for a bond in the penalty of one hundred thousand dollars on the payment of the balance of the purchase money, with condition to indemnify them for any defects of title, &c. showed that they were not looking to any conveyance by the Black Heath company, in its corporate capacity, but that they were looking to John Heth, as the holder of the stock, to a substitution to his rights as such stockholder, and to an indemnity to be provided by him personally against defects of title; I think the appellees have, under the facts disclosed by the record, a right to charge their debt on the property of the Black Heath company in the hands of the Chesterfield company as the successors of the first company.
Nor do I think the appellees were under any obligation to convene all the creditors of the Black Heath company. They were asserting their individual claim against their personal debtor. It is not a creditor’s bill calling for a distribution of the assets of an insolvent corporation amongst all entitled to- participate. They occupy, the position of any other creditor of a. corporation seeking satisfaction by judgment and execution against their debtor. The corporate property can alone be charged, and there would be as’ muck reason to require every creditor, the nature of whose claim compels a resort to equity, to convene all the creditors, as to e.xact it from these appellees. They have *361 established their debt, and shown that the property held is much more than sufficient to pay it.
But an order was made to convene the creditors. If they failed to appear before the commissioner and prove their debts, the appellees were not in fault.
After the decree establishing the right of the appellees, a petition was offered by William J. Barksdale and others, asking, for the reasons set forth in the petition, that the appellees should be required to amend their bill, and make them defendants. The motion was overruled, and they have united in the petition for an appeal; and the refusal of the court to require them to be made parties, is assigned as- error. The parties have not brought before this court the record of Barksdale v. Heth, referred to in the petition; but that perhaps would not vary the case. The motion of these petitioners seems to be of a somewhat anomalous character. The appellees have proceeded against the Black Heath company, and the Chesterfield company as its successor, to establish a personal debt; and after a decree in their favor, third persons, strangers to the proceeding, and who do not claim to be creditors even of either company, insist upon being made parties, upon the ground, in substance, that they are creditors-of John Heth, who, as they allege, was a creditor of the Chesterfield company, for certain royalties* &c. That if the Chesterfield company is compelled to pay this debt to the appellees, they may insist on deducting the amount so applied from the sum they would otherwise be liable for to John Heth, and so the ability of John Heth to pay the petitioners would be diminished to that extent.
For the same reason, every creditor might insist on his right to intervene between any other creditor and the common debtor. For a recovery and satisfaction of the debt due to one creditor would diminish the means of the common debtor.
*362 This application seeks to carry the doctrine a step fur^iei'- For this company is not the common debtor. petitioners are creditors of John Heth, and seek i° intervene between the appellees and their personal debtor, because the latter, in the event of being com-0 pelled to pay, may seek indemnity from John Heth, by applying his funds in the hands of the company to this purpose. With this question the appellees have no concern. Whether their debtor is or is not a debtor of Heth, and whether the latter is bound to indemnify the company on account of this recovery, does not affect them. The right of the company to such indemnity, and to apply the royalty, or any other funds of John Heth, under the control of the company, to that purpose, must be litigated between the company and John Heth, and those claiming under him. The appellees have shown that the company is their personal debtor, and has effects sufficient to pay the debt; and it would be most oppressive on them to be required to renew the contest with every stranger whose claims against others may be remotely and in some collateral way affected by such recovery.
I think the decree should be affirmed.
The other judges concurred .in the opinion of Allen, P.
Decree affirmed.